No. 30.—LEROY NAPIER and others, plaintiffs in error, *vs.* WASHINGTON POE and others, defendants.

[1.] Mandamus lies at the instance of a citizen, who has a clear specific legal right, and no legal remedy for its enforcement.

Napier *et al.* vs. Poe *et al.*

[2.] Commissioners appointed in an Act of the Legislature, for the purpose of carrying out its provisions, are agents, and the Act is in the nature of a power of attorney.

[3.] When an agent is appointed to do a particular thing, or to do all things necessary to accomplish a particular business, his authority includes the usual and appropriate means to accomplish the end.

[4.] If commissioners are required to receive upon the stock, ten per cent. in gold or silver, and no time is designated for the payment, they have the discretion to allow a reasonable time.

[5.] When commissioners are appointed by law, to receive subscriptions of stock to a bank, and the subscriptions are required to be *bona fide*, they have the discretion to determine what is a *bona fide* subscription.

[6.] The charter of the Manufacturers' Bank, declares " when the amount of $250,000 shall have been subscribed *bona fide*, and the sum of ten per. cent shall have been paid thereon in specie, the commissioners shall give notice for the election of directors, &c. *Held*, that the payment of the ten per. cent need not be contemporaneous with the subscription, and that a provision for payment in thirty days being made, the subscription is good against persons applying for the stock and tendering the money within the thirty days.

[7.] When a charter requires payments to be made on the stock in specie, before organization, and the bank is organized without such payments : *Held*, that it is a mere nullity, and cannot exercise any of the privileges of the charter.

Mandamus, in Bibb Superior Court. Decided by Judge Powers. May Term, 1852.

The facts of this case are as follows :

In 1850, the Legislature enacted a charter creating the Manufacturers' Bank of Macon, by which it was provided, that the defendants, Washington Poe and others, should be commissioners, to receive subscriptions for stock; that whenever the sum of two hundred and fifty thousand dollars should be subscribed *bona fide,* and ten per cent. thereon paid in gold and silver, or the notes of specie-paying banks in this State, said commissioners should call a meeting of the subscriers, to elect five directors, who should be citizens of Georgia, &c. The commissioners, in pursuance of the charter, advertised that the books would be opened in Macon for subscriptions, on the 1st Monday in April, 1850 ; but no one appeared to take stock, until March, 1852, when Robert Collins and others, came forward and sub-

scribed for the whole amount, paying to the commissioners ten per cent. in drafts at thirty days, on New York, and partly on banks in Macon; which drafts when due, were paid in specie. Subsequently, in the same month, the relators, Leroy Napier and others, came forward and offered to subscribe for the whole amount of stock, tendering to the commissioners ten per cent. in cash, as required by the charter.

The commissioners refused to receive these second subscriptions, and a mandamus was applied for, to compel them to do so, alleging that the first subscriptions were illegal and void, because,

1st. The ten per cent. of cash was not paid as the terms of the charter required; and

2nd. That but three of the parties subscribing were citizens of Georgia, and the charter made no provision for transfer of stock, before the organization of the bank; so that there could not be five directors citizens of Georgia, as provided by the charter. On these grounds the relators prayed that the commissioners be ordered to issue the stock to them, and not to the first subscribers.

On hearing the application for a mandamus, it was refused by the Court; to which refusal the relators excepted.

GRESHAM, for plaintiffs in error.

POE, NISBET and POE, C. B. COLE, for defendants.

J. J. GRESHAM, for plaintiffs in error, made the following points:

1. Mandamus, in Georgia, is a writ of right. It is in the nature of a suit, and will be granted when the relator shows a right for which he has no appropriate remedy. 4 *Geo. R.* 115. 12 *Johns. R.* 414. 1 *Cow. R.* 417. 1 *Wend. R.* 318.

2. Commissioners appointed by Act of the Legislature, to organize a bank, are ministerial officers, and can exercise no power not expressly conferred.

3. A subscription for stock of a bank before its organization,

Napier *et al. vs.* Poe *et al.*

when a certain amount is to be paid preliminary to its organization, cannot be enforced. *Jenkins vs. Union Turnpike Co.* 1 *Coin's Cases,* 86. *Crocker vs. Crane,* 21 *Wend. R.* 211. *Dutchess Cotton Manfg. Co. vs. Davis,* 14 *Johns. R.* 245. *Chester Glass Co. vs. Dewes,* 16 *Mass.* 94.

4. Where the charter requires that a certain amount shall be paid to the commissioners at the time of subscription, the subscription is incomplete, until that payment is made in the manner pointed out by the Act. See same authorities. *Angel and A. on Corp.* 475, 476, 478-9. *Ibid,* 69.

5. The payment of 10 per cent. of the subscription, being required by the Act, before the bank can be organized, until that payment is made, the subscriber may repudiate his subscription, and therefore the payment is the only evidence of the *bona fides* required by the charter.

6. The charter of the Manufacturers' Bank of Macon, requires that transfers of stock shall be made by the stockholder or his attorney, in the books of the bank. Therefore, although a transfer may be binding between the parties before such entry is made, the bank cannot recognize any stockholder until the transfer is made on its books; and having no existence until the election of directors before the commissioners, and no books, none but an original subscriber can be a director. *Angell and A. Corp.* 509-10, 513.

The following was submitted by C. B. COLE, for defendant in error.

1. A mandamus will not be granted to a relator for his relief, except where he has a *specific legal right* and no other specific remedy. The relators have no *specific legal right* to the stock of the Manufacturers' Bank. 2 *Iredell's Law R.* 430. 1 *Alabama R.* 15. *Dudley's Geo. R.* 37. 4 *Geo. R.* 26. 6 *Bacon's Abr.* 418. 5 *Geo. R.* 522. 1 *Geo. R.* 271. 3 *Kelly's R.* 297. 1 *Cowen's R.* 423. 2 *Kelly's R.* 214. 8 *East's R.* 219.

2. All those facts should be alleged in the writ which are necessary to show that the party applying for it, is entitled to

the relief prayed for. The relators do not show that they are entitled to this stock. 7 *Term R.* 52. 7 *East's R.* 845.

3. The payment of ten per cent. is not a condition precedent to vesting the right to the stock in the subscribers thereto. The subscription for the stock was *bona fide*, and evidenced by giving their checks or drafts for specie. The words used in the Act of incorporation show that the payment of the ten per cent. was to be a future act. See *Acts of* 1849, *page* 56, *sec.* 6 *and* 7.

4. "The giving a check or draft is an absolute appropriation of so much money in the hands of the drawer to the holder of the check, and there it ought to remain until called for." 4 *John. R.* 296. 1 *Hall's R.* 56. 2 *Story's R.* 502.

5. The original subscribers to the stock, could transfer a part or a whole of their stock before the organization of the bank, so as to constitute a citizen of Georgia a stockholder, and qualified to be a director. 2 *Cowen's R.* 770. 8 *Pickering's R.* 90. 10 *Mass. R.* 476.

A mandamus will lie only in cases which concern the public, and not where they are merely of a private nature. 1 *Swift's Dig.* 577. 1 *Cowen's R.* 512.

The public have no interest in the question between these parties.

The writ is prospective, and if a past privation of a right is sought, a bill in Chancery is the proper remedy. 1 *Swift,* 578.

Special jurisdiction is conferred on the commissioners, and their judgment is conclusive. 9 *Geo. R.* 367, *head note,* 2.

The subscription by *Collins and others,* created a debt to the Bank.

*By the Court.*—NISBET, J. delivering the opinion.

In 1850, the Legislature incorporated the Manufacturers' Bank of Macon. For the purpose of establishing the bank, and carrying into effect the Act of incorporation, Washington Poe, John L. Jones, James Ray, Thaddeus G. Holt and Charles Day, were appointed commissioners. It is farther stated in the Act,

that they are appointed commissioners, for the *purpose of receiving subscriptions to the capital stock of the company.* The Act prescribes the duties of these commissioners thus : " The said commissioners shall meet on the first Monday in April next, to receive such subscriptions, after having advertised in the gazettes of the City of Macon thirty days. When the amount of two hundred and fifty thousand dollars shall have been subscribed *bona fide,* and the sum of ten per cent. thereon shall have been paid in. gold or silver, or the bank notes of this State, paying specie, to said commissioners or a majority of them, who are hereby authorized to act, they shall give thirty days' notice to the stockholders for an election of directors of said bank. After the election of directors, the said commissioners shall pay to the directors the amount of money received by them for subscriptions to the capital stock of said company, and be discharged from their duties. *Provided,* that if the sum of two hundred and fifty thousand dollars shall not be subscribed at the meeting of said commissioners, they may adjourn from time to time, until the said amount shall be raised." *Acts of* 1850, *page* 54. Accepting the trust thus delegated by the Legislature, a majority of the commissioners having given the thirty days' notice in the gazettes of the City of Macon, as required by the law, met on the first Monday in April, 1850, to receive subscriptions to the capital stock of the bank. At this time no stock was taken, and the commissioners adjourned. Nothing farther was done or attempted to be done by them towards the organization of the bank, there being no demand for the stock, until the 6th day. of March, 1852, when a majority of them again met, for the purpose of receiving subscriptions to the stock of the bank. At this time the whole of the stock was taken by Messrs. Davis T. Brooks, J. Brooks, Alexander and Collins. In payment of the ten per cent. on the shares required by the charter, the commissioners received drafts on New York, at thirty days, drawn by Mr. Davis, and payable to his order in specie, for 20,000 dollars. These drafts for 10,000 each, were directed to Samuel R. Brooks, New York, endorsed by Davis, payable to Isaac Scott, agent or order, and by Isaac Scott, agent, payable to J. T. Soul-

tier, cash or order.   They were accepted by S. R. Brooks, and paid in specie—one on the 19th of March, and the other on the 27th of March, 1852.   For the balance of the ten per cent. they received checks from D. Collins and Mr. Alexander, on the agencies of the banks in Macon for $2500 each.   These checks had not been presented for payment at the time when the respondents answered, but they say that D. Collins had requested T. G. Holt, in whose possession they were left, to call and get the money.   On the 15th day of March, 1852, the relators appeared before the commissioners, at the store of J. L. Jones, in the City of Macon, and proposed to subscribe for the whole of the stock of this bank, each offering to take five hundred shares, and each tendering the sum of $5,000, in notes of the banks of the State paying specie.   The money was counted by the commissioners, but they declined to receive it, or to permit them to subscribe.   The commissioners present on that day were Messrs. Holt, Jones and Ray ; afterwards the whole of the commissioners met, except C. Day and Jones, and there being a difference of opinion as to the question involved, they then declined to give the stock to the relators.   Under these circumstances, the relators sued out a petition, returnable before Judge *Powers*, asking a mandamus to be issued, requiring the commissioners to allow them to subscribe for the stock of the Manufacturers' Bank, which they had proposed to take on the 15th of March—to receive the money tendered in payment of the ten per cent. required by the charter—to issue them scrip for the stock, and to advertise for an election of directors, or show cause to the contrary.   Upon the hearing, they moved the Court to issue a writ of mandamus against the commissioners, upon the following grounds :

1. Because the subscription to the stock of this bank, by S. R. Davis and others, on the 6th of March, was illegal and incomplete, in this, that the sum of ten per cent. on the stock was not paid by them in gold or silver or in notes of the banks of the State paying specie ; and that before such payment, the books ought to have been declared open, on the application of the re-

Napier *et al. vs.* Poe *et al.*

lators, and the stock given to them when the tender of the notes of the banks of this State paying speice was made.

2. Because the drafts and checks received by the commissioners in payment of the ten per cent. on the stock was not such a payment as the charter requires to be made, and until such payment was made, the subscriptions of Davis and others, was inchoate and incomplete, and the commissioners had no right to advertise for the election of directors, but ought, upon the application of the relators, and their tender of the money before any money was paid by said Davis and others, to have declared the first subscription nugatory, and allowed the relators to subscribe for the stock.

3. Because, by the charter, subscriptions are required to be *bona fide,* and the only evidence of the *bona fides* is the payment of ten per cent. on the stock, in gold, silver or the notes of specie-paying banks; and that such payment not having been made, the subscriptions of Davis and others were not *bona fide,* and therefore void, ought to have been so declared by the commissioners.

4. Because only three of the first subscribers are citizens of Georgia and the charter requires the directors to be citizens of the State, and inasmuch as the charter makes no provision for the transfer of the stock before the bank is organized, the bank could not be organized by them, and therefore, their subscriptions were void, and ought to have been so held by the commissioners.

The Court denied the motion of the counsel for the relators and dismissed the petition, whereupon they excepted, and have assigned for error the overruling the several grounds of the motion, as above stated.

All of these questions depend mainly upon a construction of the charter, and cannot be elucidated to any profitable extent by authority. The great question in the case is as to the validity of the first subscription to the stock. If, as the plaintiffs in error contend, that subscription was not according to the requirements of the charter, it is a mere nullity, and they are entitled to the stock; and having a clear legal right and no other remedy, they are entitled to the remedy by *mandamus.*

vol. xii  23

*In Georgia*, it is not to be questioned but that in such a case, the process of *mandamus* is a remedy at the command of the citizen.   Although, it is in England denominated a prerogative writ, yet it lies in Georgia at the instance of any individual, who having a legal right has no remedy other than mandamus for its assertion.   If, however, the relators have not a legal right to the stock which they claim, then they have no remedy by mandamus or otherwise.   The right to the stock  cannot be in them and in the first subscribers at one and the same time.   If neither the relators nor the first  subscribers  are entitled to it, equally must the  relators fail.   So the  question  returns, was the first subscription valid ?   And still again, as anterior to that, springs the inquiry, was that subscription made  according  to the requirements of the charter ?   The  inquiry  perhaps, may be  yet farther  simplified, by  inquiring, did the  commissioners act in accordance with their duties, as prescribed in the charter ?

[2.] The will, the  intention of the Legislature, is  to  be  ascertained  as  to  the  terms  and  conditions  upon  which  the stock of this bank was to be taken.   These commissioners were appointed for the purpose, as  the Act declares,  of  carrying it into effect, and establishing the bank.   They are more specifically declared to be  appointed " for the purpose of  receiving subscription to the capital stock of the company."   That is, as I understand the charter, they were appointed to carry out  the Act, and  establish  the  bank, *by  receiving* subscriptions  to  the  stock. This, though  the  chief, is  not  the  sole  duty  assigned  them. Farther, they are by necessary implication, to receive the payment of *ten per cent.* on the stock, and  they are  expressly required to advertise for the election of  directors, and to turn over to them when  elected, the money so received.   When  these things are done, they have fulfilled their trust and  are  discharged.   Now it is true, as  claimed  by the  counsel, that  corporations take nothing by implication ; grants of franchise are  to be  strictly construed.   Yet it is to be noted, that in determining the duties of these commissioners, we are not passing upon the privileges and immunities of the *corporation*, but upon the powers  of public agents, existing and to be exercised *anterior* to the organization

Napier *et al. vs.* Poe *et al.*

of the corporation.    The same strictness of interpretation, there-
fore, is not required, which would be necessary, were we sitting
in judgment on this charter, in reference to the rights of the
corporation.

The commissioners are the fiduciary agents of the Legislature,
appointed to do certain acts *preliminary* to the organization of
the bank.    The Act defining their duties, is in the nature of a
power of attorney.    *State of Illinois vs. Delafield,* 8 *Paige R.*
527.    26 *Wend.* 192.    They are not special agents clothed with
power to do a single act, nor are they what is sometimes desig-
nated in the books as *universal* agents, clothed with plenary au-
thority to represent a principal in every thing ; but are general
agents with specified powers.

[3.] The Act defining those powers is not to be so construed
as to give to them authority to do any thing other than those
things which are specified ; nor is it to be so strictly construed
as to divest them of all discretion as to the manner of doing
those things which are specified, if the manner is not expressed.

[4.] If they are, for example, required to receive upon the
stock *ten per cent.* on each share subscribed, and no particular
time is designated when it shall be paid, a discretionary power
as to the time is implied.

[5.] Or if they are required to dispose of the stock to persons
who will subscribe *bona fide,* and the Act does not declare what
shall be evidence of *bona fides,* they have implied power to de-
termine what is or is not a *bona fide* subscription.

" If, says *Chanccellor Kent,* the powers of an agent are special
and limited, he must strictly follow them ; but whether there be
a special authority to do a particular act, or a general authority
to do all acts in a particular business, each case includes the
usual and appropriate means to accomplish the end." *Kent's
Com. vol. 2nd, p.* 617.    *Paley on Agency, by Loyd,* 197.    *Story
on Agency, sections* 58, 74, 85.    5 *Hill's N. Y. R.* 16.

[6.] Such are the rules applicable to agencies generally, and
they apply to agencies created by the State, as well as to others.
Guided by such views of the agency of the commissioners, and
such rules of construction as to the power under which they

acted, we are now to inquire what were their duties, and whether they did in fact, in the subscriptions made by Mr. Davis and others, act within their authority.   In pursuance of the directions of the Legislature, they did meet on the first Monday in April, having first advertised in the gazettes of Macon thirty days.  At that time no application for stock was made, and they adjourned.   The charter lay unappropriated until they again came together some two years afterward, on the 6th of March, 1852, when the stock was taken by Messrs. Davis, Brooks, and others.   Of this last meeting, it does not appear that they gave any notice, and their failure to do so, is claimed as a departure from the duty prescribed in the Act.   Whilst the Act requires notice in the first instance, it does not require notice of any subsequent meeting.   It is fairly to be inferred, that such notice is not required, from the *proviso* to the 6th section of the Act.  It declares that if the sum of $250,000 shall not be subscribed at the meeting of the commissioners, they may adjourn from time to time, until that amount shall be raised.   Whether they did or not make a formal adjournment at their meeting in April, 1850, does not appear.   Nor is it material, for, as under the Act, they are authorized to meet again or often, they would stand adjourned to such time as circumstances might make it necessary for them to meet, without any formal designation of time.   They waited until there should be a demand for the stock.   It could not have been the intention of the Legislature to require men acting under some responsibilities, and without compensation, to keep up a continuous organization, and to hold regular meetings. How long, it might be asked, would the formal meetings be required of them ?   If for two years, then with equal reason for four, or eight, or sixteen.   All that was required of them was, after the first meeting, to hold themselves in readiness to .act whenever application was made for the stock.   The charter being a public Act, was notice to all the world of its existence, and its dormancy must have been a matter of notoriety.   The object of giving notice, is to open a fair field for the subscription to the stock, and to prevent a monopoly.   The reason upon which the necessity of notice rests, did not exist in this case.

For two years, the charter lay unaccepted by any body; during all that time, it was open to the acceptance of the relators as well as all other persons. The facts negative the idea that there was any monopoly or other unfairness in the subscription. We do not think that the objection founded on a failure to give notice, amounts to anything.

*When* the amount of two hundred and fifty thousand dollars shall have been subscribed *bona fide*, and the sum of ten per cent. thereon, shall have been paid in gold and silver, or the bank notes of the banks of this State, paying specie; *then* they are required to give notice to the stockholders for an election of directors. As the notice to the stockholders is required to be given after the subscription and payment of the ten per cent. the receiving of the subscriptions and the money are made the duties of the commissioners. First, they are required to take subscriptions to the amount of $250,000. The only condition annexed to the subscription is, that it be *bona fide*, and it is clearly their duty to take none that is not *bona fide*; they are bound to see to it, that the subscriptions which they allow are *bona fide*. The Legislature has not declared in what this *bona fides* shall consist, or what shall be evidence of it. The power, therefore, to determine these things is, by a necessary implication, given to them. They would unquestionably be governed by the usual meaning of the phrase, as applicable to such a transaction. A *bona fide* subscription, is a subscription in good faith; that is, with an honest purpose to comply with the requirements of the charter, and to execute its provisions. It must be considered as standing opposed to any collusion between the commissioners and the subscribers, and to a purpose to violate the law in any particular. There is no allegation of bad faith on the part of the commissioners; they are, as they deserve to be, wholly unassailed by this proceeding; nor do I understand the relators to charge upon these subscribers a fraud, in fact. The charge is, simply, that the subscriptions are illegal. One of the grounds of error taken in the assignment is, that the subscription was not good, as against the subsequent application of the relators, because

not made *bona fide*; and this ground is sustained by counsel, upon the assumption that no subscription is *bona fide*, unless the *ten per cent.* is paid at the time of entering it. They say, that under this Act, it was the duty of the commissioners to disallow all subscriptions, unless accompanied by the actual payment of the money, or a tender of it, in gold, silver, or the notes of specie-paying banks. The actual payment of the money, at the time, would, without doubt, be evidence of *bona fides* of the highest character; and allowing the subscriptions without payment or provision for payment, in specie, or specie funds, would be in violation of the instructions of the commissioners, and void. If, indeed, it be true, that the Act requires the money to be paid at the time when the subscription is made, then, I admit that there is no escape from the conclusion of the counsel for the plaintiff in error. For if that is required, the subscription would be void, no matter what other evidence is furnished in the record, that the subscription was *bona fide*. The agents would be bound to act according to an instruction so specific and unambiguous. But we do not think that this is required, and so thinking, we deny the proposition that this subscription is void, because not *bona fide*, in this, to wit: that the money was not paid at the time. To the question, whether the Act requires the subscription and the payment to be cotemporaneous, I shall revert, directly. Upon the assumption, then, that the *bona fides* is not alone demonstrated by the contemparaneous payment of the money, I say that the subscription and the payment may be separated, and being separated, the question is, what was the duty of the commissioners, in regard to the subscription? I answer, to see to it that it was *bona fide*, according to their judgment of what the Legislature intended by the phrase, in its connection with the transaction of subscribing. In the exercise of that judgment, they determined that the subscription was good, if provision was made at the time, for paying *ten per cent.* on $250,-000, within a reasonable time. Acting upon this view of the matter, they allowed the subscription, upon the subscribers making and delivering specie drafts on New York, at 30 days, for $20,000, and checks at sight on the agencies of the banks of

Macon for $5,000—the amount of the *ten per cent.* required to be paid, being $25,000. Let it be remembered, that the relators do not charge upon the subscribers insolvency, corrupt motives, or any intention in any way to violate this charter or any other law of the State. They stand before this Court, on this record, as men of unquestioned credit, and of undoubted commercial honor. We are not permitted, therefore, to presume that the commissioners knew, or had reason to know, that these drafts and checks would not be paid, acccording to their face; the contrary is the presumption which we are constrained to raise.

Once yield the point that the Act does not require the payment of the *ten per cent.* at the time of the subscription, and there can be no pretence that it was not *bona fide*; because in its every phase, it bears the impress of an honest purpose, on the part of both the commissioners and the subscribers. It is not to be presumed that these checks and drafts were given to be dishonored; it is not to be presumed that men having credit would wantonly and voluntarily contrive to impair it; it is not to be presumed that men without credit, would enter into engagements with knowledge that they would not be met, when the operation could not result in any possible way to their benefit. They could not be presumed to have been influenced by the hope of getting control of the charter without paying for the stock; they are to be considered as having acquainted themselves with its provisions, and it is very explicit in requiring *ten per cent.* to be paid in specie, or its equivalent, *before* the bank could be *organized;* they are not to be held as acting under the influence of a feeling of antagonism to the relators or any body else, because it does not appear that the relators or any body else, wanted the stock at the time they subscribed for it. The legal presumption is, that when men draw drafts, they will have funds in place to meet them at maturity; and a bank check is an appropriation of so much of the funds of the drawer on deposit to the use of the drawee. We are bound to believe that all these considerations influenced the parties in this transaction, and from none of them can any inference be drawn unfavorable to good faith. Besides, the course taken by the

commissioners, was in accordance with the usage in such cases; not being required to demand the *ten per cent.* to be paid at once, it was according to the course of business to raise it in specie, upon the plan adopted.   It was doubtless convenient to the subscribers, to draw upon New York, for the specie, and it was expedient to draw it thence, rather than from the vaults of our own banks.   The result demonstrated that the conclusion to which the commissioners arrived, as to the *bona fides* of the subscription, was a just one, because the drafts on New York were paid before their maturity.

The hinge upon which the merits of this cause turns, is the question, does the Statute require the *ten per cent.* to be paid *contemporaneously* with the subscription.   As before admitted, if it does, the plaintiff in error is right, and all our reasoning upon the *bona fides* of the subscription goes for nothing.   If the charter requires this to be done, the requirement is either expressly made, or it is made by implication.   It clearly is not expressly made.   The Legislature have not said in so many words, that the money should be paid at the time when the stock is taken. Looking to the organization of the bank, they have said *when* $250,000 of the stock shall be .subscribed *bona fide,* and *ten per cent.* thereon shall be paid in gold, &c. the commissioners shall then give notice for an election of directors.   That is, *when* the stock shall be subscribed, and *when* the ten per cent. shall be paid, *then* and not till then, shall the notice for the election be given.   Two things the commissioners are required to do— take the subscription *bona fide,* and collect the money.

[7.] The Act does not say when the money is to be paid; so far as time is concerned, all that is required is, that it be paid before the notice is given for the election.   It is plain that the Legislature intended the payment to be preliminary to *organization;* I do not doubt but that they intended that unless the *ten per cent.* was paid, and paid in gold and silver, or specie funds, the bank should never go into operation.   But they have not designated the time when it should be done; that is left to the discretion of the commissioners.   Not being expressed, is this requirement implied?   It is insisted that it is, upon several

grounds.  And *first*, it is argued that it is implied, because, if the commissioners have any discretion in the matter, it is an unlimited discretion, and that *such* discretion is incompatible with the object of their appointment, to wit, the organization of the bank. If, say the counsel, the commissioners may give 30 days, they may give 60, or 120, or 240, and thus the end of their trust be defeated.  This objection is satisfactorily answerable.  The Act fixes no time, at which or within which, the bank is to be organized.  If it did, and at so near a day, that it would defeat the organization, if time were given on the payment, the inference would be irresistible, that no time was to be given.  Not fixing a time for the *organization*, that is left to the commissioners, and from *that fact* we infer some discretion as to time of payment.  Nor is this discretion unlimited.  The rule is, that if a discretion be given to an agent in the execution of his powers, by implication, it is to be understood as being a* *reasonable* discretion, with reference to the object and purposes of his agency ; so, here the discretion as to time of payment is limited by a regard to the objects of this agency.  A time of payment so long as to defeat the end, could not be given, but a time reasonably consistent with an early accomplishment of the object, was, we think, within their discretion.  *Secondly*, it is said that no discretion can be impliedly given to the commissioners, which may defeat the manifest policy of the Statute—that the policy of the Statute is to insure sound banking—that this policy is enforced by prohibitions against banking at all, until a certain proportion of the stock is *in fact* paid in specie or specie funds, and that the discretion which we claim for the commissioners will defeat that policy.  And from these propositions springs, necessarily, the conclusion, that the payment of ten per cent. must be made at the time when the subscription is made.

The policy of the Act is truly stated by the counsel.  It is to guard the public against dishonest banking, and a spurious currency.  This is evinced in almost every section of the charter, and particularly in requiring ten per cent. to be paid in specie or specie funds, before the bank can be organized, and in requiring $125,000 to be paid into the bank, $50,000 of which

shall be in actual gold and silver, before the directors are authorized to issue notes. I do not hesitate to say that these are conditions to the Legislative grant, which if not fulfilled, the franchises of the charter can never be enjoyed. We are all clear that if the ten per cent. is not in fact paid in gold or silver, or the bills of the banks of Georgia paying specie, before organization, the organization is a nullity, and no powers of any kind can be exercised by it under this charter; and that if the directors, being legally elected, should issue bills without $125,000 being in fact paid in, and without $50,000 being in actual gold and silver, such issue will avoid the charter; and so far as this Court is concerned, if its powers are ever invoked for the purpose, we shall hold this corporation and all others to a strict and *actual* compliance with the provisions of their charters. We shall allow no evasion, and no substitute, but shall require the compliance to be *actual* and *truthful.* These remarks are not made because we anticipate a violation of this charter, for we anticipate nothing ; but that those persons interested in banking may all know upon what terms banking is for the future to be conducted. Those terms are such as the Legislature have or may prescribe. It is also true that a discretion in the commissioners that will either defeat or weaken this policy of the Legislature, cannot be implied. But we take issue with the learned counsel, upon the fact, that the discretion which we claim for them, and which they did exercise, either defeats or weakens the policy of the charter. The force of this argument is derived from the assumption that the bank could be organized upon the securities taken by the commissioners, as a substitute for specie. There is no evidence in the record, that the commissioners ever contemplated such an attempt; on the contrary, it is to be inferred from the fact that the New York drafts were payable in specie, and from all of the circumstances of the transaction, that they intended to collect and pay over the *ten per cent.* in specie or notes of specie-paying banks. But the bank could not be organized upon them ; turning over these papers to the directors would be no payment to them of the *ten per cent.* If the directors were elected without this sum

being paid in gold or silver, or bills of specie banks, and the organization completed, it would be a nullity; it could exercise no privilege of the charter; it could not sue upon the drafts and checks, for the reason that the specie-payment is a condition precedent to organization. *Crooker vs. Crane,* 21 *Wend.* 220. 1 *Cain's Cases in Error,* 94, '5. 9 *Johns. R.* 217. 11 *Ibid,* 98. 14 *Ibid,* 238. Nor would this arrangement of the commissioners cause any unreasonable delay in organizing the bank. Whether these drafts and checks could or could not be enforced by the commissioners, is a question which need not be decided. Two things are plain; one is that the subscribers would have no right to require the commissioners to give the notice for the election of the directors until they had paid the money; and the other is, that the commissioners, upon their failure to pay at the maturity of the drafts, would have the right to consider the arrangement at an end, and open books at once for new subscriptions. If paid, the organization would proceed, and no question could be made about the liability of the subscribers on the drafts and checks; and if not paid, then the commissioners could proceed to let out the stock to others, with no violation of the charter, and with such delay only, as could work no public injury or inconvenience.

Conceding to the counsel, that this subscription is to be held inchoate, and still I cannot see that the relators are entitled to prevail. If it be true that Davis & Co. had not, at the time that the relators made their application for the stock, a perfect right to it, yet it does not follow that *they* had a clear legal right to it. They must stand upon their legal rights, and not upon the imperfect subscription of their adversaries; that subscription was, to say the least of it, *infieri,* and so continued until the maturity of their drafts, and whilst thus in process of being made, the relators had no right to displace them, and take up the stock. They had an interest in the stock sufficient to authorize the commissioners to postpone others until the expiration of the time agreed upon, for the payment of the money. I do not consider this as letting out the stock upon the credit of the subscribers; the time given was an arrangement for payment,

very different from the miserable habit of taking stock notes after a bank is organized. Here the commissioners had the game in their own hands—in their power, if the drafts were not paid, to annul the whole transaction, and proceed *de novo*. As well might the relators have claimed the right to push aside a subscriber, whilst the commissioners are in the act—not yet completed—of counting his money, as to step in, under all the circumstances of this case, and set aside these subscribers before their drafts were at maturity.

The only remaining objection to this subscription, grows out of the requirement of the charter, that the directors, five in number, shall be citizens of Georgia. The return of the commissioners shows that five persons only, subscribed for the stock, and that two of them are non-residents. The objection is, that the subscription was illegal, because the bank could not be organized, there not being stockholders eligible, enough to make a Board of Directors. To make this objection valid, it is farther assumed, that there can be no transfer of stock, until the bank is organized. The last proposition I will not discuss, because it is not necessary for us to decide it; suffice it to say that there is no qualification prescribed for subscribers, nor any direction to the commissioners, as to whom they shall admit as subscribers; they are not called to sit in judgment upon the qualifications of directors; whether the bank shall be legally organized after they shall have discharged their duties, is not for them to determine.

Let the judgment be affirmed.